## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SUSAN ENDL, as Administrator *Ad Prosequendum* of The Estate of Eli Endl,** | Civ. No. 2:12-3564 (KM)(MAH) |
| **Plaintiff,** | **OPINION** |
| **v.** | |
| **STATE OF NEW JERSEY *et al.*,** | |
| **Defendants.** | |

### KEVIN MCNULTY, U.S.D.J.:

This action arises out of the death of Eli Endl, which occurred in March 2010, when he was an inmate of Northern State Prison. Plaintiff, as Administrator, asserts diverse claims against various defendants, but the focus here is on her claims of medical malpractice against the University of Medicine & Dentistry of New Jersey ("UMDNJ") and affiliated medical personnel. She alleges that the defendants' collective failure to provide adequate medical care caused the death of her son.

Now before the Court are two motions:

(a) Motion (ECF no. 73) of defendants UMDNJ, John Godinsky, MD, Sharmalie Perera, MD, Veronica Nendze, RN, Maria Delgado, RN, Theresa Jocen Boblick, LPN, David Maxey, PhD, Alan Kaye, MD, and Anasuya Salem, MD, for summary judgment;

(b) Motion (ECF no. 72) by defendant Bernice Picerno-Jones, R.N., to dismiss Counts 7, 8, and 9 of the Second Amended Complaint ("2AC").

(In this Opinion, I will refer to the individuals named in paragraphs (a) and (b) as the "Medical Defendants", to distinguish them from the others.)

Both motions assert that the malpractice claims against the Medical Defendants must be dismissed because the plaintiff has failed to provide a legally adequate Affidavit of Merit, as required by N.J. Stat. Ann. § 2A:53A-26 *et seq.* For the reasons stated herein, these defendants' motions for summary judgment will be granted in part and denied in part.

The Affidavit of Merit Statute was designed to permit early dismissal of meritless claims for which no expert support could be found. It is, however, bafflingly drafted, and it can spawn complex, collateral meta-litigation over the AOM requirement itself. (This is the second round of AOM-based motions in this case.) The New Jersey Supreme Court, citing "confusion in the ranks" of the trial bar, has imposed additional procedural safeguards against forfeiture, but these do not apply in federal court. The AOM requirement does result in dismissal of claims, but the Court may be excused for doubting whether there has been a gain in efficiency, and for wondering how closely such procedural dismissals correlate to the claims' lack of merit. In short, I believe that the AOM Statute is ripe for a legislative second look in light of experience. As things stand, however, I am bound to apply the statute as written, and I will do so.

## I.  BACKGROUND

### A.  Prior Complaints, Motions, and Answers

The original complaint was filed on March 21, 2012, in New Jersey Superior Court, Essex County; removed to this district court on June 13, 2012; and assigned to the Hon. William J. Martini, U.S.D.J. (ECF no. 1). The case was reassigned to me on August 1, 2012, the same day the First Amended Complaint was filed. (ECF nos. 9, 10). UMDNJ filed an Answer to the First Amended Complaint on August 14, 2012. (ECF no. 13). Less than a month later, on September 10, 2012, the Plaintiffs moved to amend the complaint a second time. (ECF no. 14). Magistrate Judge Mark Falk granted the motion to amend and terminated a pending motion to dismiss the First Amended Complaint. (ECF no. 19).

### B.    Allegations of the Second Amended Complaint

On November 26, 2012, Plaintiffs filed the Second Amended Complaint, which is the currently operative pleading. (2AC, ECF no. 20). The allegations, *qua* allegations, of the 2AC are relevant as background to these motions.

Eli Endl, now deceased, was an inmate at Northern State Prison in Newark, Essex County, New Jersey. 2AC ¶ 1. Plaintiffs, Susan and Anthony Endl, are the natural parents of Eli Endl. *Id.* ¶ 2. Susan Endl is the designated administrator *ad prosequendum* for the benefit of Eli Endl's estate. *Id.* ¶ 3. (In this opinion, "Plaintiff" refers to Susan Endl; "Endl" refers to Eli Endl.)[1]

Defendant New Jersey Department of Corrections ("DOC") is a subdivision of Defendant State of New Jersey. DOC operates Northern State Prison. *Id.* ¶¶ 4-6. Defendants Lanigan, Hayman, and Lagana, not involved in these motions, are administrators in DOC.

The movants here are as follows: Defendant University of Medicine and Dentistry of New Jersey ("UMDNJ") is a state university contracted by New Jersey to provide medical care and attention, and health and hospital services, to inmates housed at Northern State Prison. *Id.* ¶ 7. The Medical Defendants, John Godinsky, M.D., Sharmalie Perera, M.D., Veronica Nendze, R.N., Maria Delgado, R.N., Theresa Jocen Boblick, L.P.N., Bernice Picerno-Jones, R.N., David Maxey PhD, Alan Kaye, M.D., and Anusuya Salem, M.D., allegedly provided medical care and attention to inmates at the prison, including Eli Endl. *Id.* ¶¶ 15-18.

Between March 21, 2010, and March 25, 2010, Eli Endl required medical care. *Id.* ¶¶ 21-23. At 9:20 pm on March 21, 2010, Bernice Picerno-Jones, RN, documented that Endl complained of chest cavity pain from his shoulders past his abdomen. *Id.* ¶ 23. She reported that he had been given 650 mg of Tylenol at 9:00 pm, but allegedly no further medical workup followed. *Id.* On March 22, 2010, Endl required medical attention for a complaint of bil[ateral] flank pain,

---

[1]     An earlier dismissal left Susan Endl, not individually but as Administrator, as the sole Plaintiff on behalf of the deceased Eli Endl. (ECF no. 67)

tenderness, and chest pain. The complaint, seemingly quoting a medical chart, reports "ekg done sinus brady, incomplete rbbb." *Id.* ¶22 (unexplained, but apparently a reference to an echocardiogram that showed a slow heart rate). On March 24, 2010, Endl had an office visit for blood in sputum, excessive sputum, cough, wheezing, and was diagnosed with "bronchitis-c/o cough with excessive sputum and blood." *Id.* The complaint does not state which medical personnel were involved. At 8:56 pm the same day, Endl was found unresponsive in his cell by a corrections officer. *Id.* Endl died on March 25, 2010. *Id.* ¶ 26.

The counts of the Second Amended Complaint relevant to these motions sound in medical malpractice. Plaintiff alleges that the Medical Defendants denied or deprived Endl of "proper and necessary medical care and attention" by misdiagnosing and failing to properly treat congestive heart failure, aortic dissection, Marfanoid symptoms, psychiatric problems, and other conditions. *Id.* ¶ 23.

Plaintiff alleges that the care Endl did receive was provided "carelessly, recklessly and negligently." *Id.* ¶ 24.  She further alleges that as a "direct and proximate result" of the Medical Defendants' failure to provide the required medical attention, Endl sustained pain and suffering, and died. *Id.* ¶¶ 25, 26.

## C.  Prior Motion to Dismiss 2AC on Affidavit of Merit Grounds

UMDNJ and the Medical Defendants moved to dismiss the 2AC pursuant to Rule 12(b)(6) based on Plaintiff's failure to comply with the state-law requirement of an Affidavit of Merit. (ECF no. 48).[2] In response, Plaintiff argued (1) that the "common knowledge" exception to the Affidavit of Merit requirement applied, citing *Hubbard v. Reed,* 168 N.J. 387, 396–97 (2001); and that, in the alternative (2) the period within which to file an Affidavit of Merit had not yet begun to run because the defendants had not yet answered the Second

---

[2]     All defendants (not just movants here) filed a total of three motions to dismiss the Second Amended Complaint. (ECF nos. 34, 35, 48). These were granted in part and denied in part. (ECF nos. 66, 67)

Amended Complaint. (ECF nos. 56, 56-1) I did not reach Plaintiff's first contention, but denied the motion to dismiss based on the second.

The AOM Statute requires the filing of an Affidavit of Merit within 60 days (extendable to 120 days) "following the date of filing of the answer to the complaint by the defendant." N.J. Stat. Ann. § 2A:53A-27. Although the Medical Defendants filed an Answer to the First Amended Complaint, the Plaintiff within a month moved to file the Second Amended Complaint. (ECF nos. 13, 14) This time, in response to the 2AC, the Medical Defendants did not answer, but filed comprehensive motions to dismiss instead. As to the 2AC, then, no answer had yet been filed. I held that the relevant "answer" for purposes of the deadline would be the yet-unfiled answer to the Second Amended Complaint. Accordingly, as to the 2AC, the time limit to file an Affidavit of Merit had not yet begun to run.[3]

Since the time had not begun to run, let alone expired, the failure to file an Affidavit of Merit could not furnish grounds to dismiss the 2AC. I therefore denied that component of the motion to dismiss. (ECF no. 66 at 17–20)

---

[3]     My opinion made due allowance for a plaintiff's bad faith filing of an amended complaint simply to resuscitate an expired deadline to file the Affidavit of Merit. No such factors were present here, however. Here the Plaintiff filed the motion to amend, and the 2AC itself, when any deadline based on the First Amended Complaint had not yet expired. No prejudice flowed from a holding that Plaintiff's decision to quickly supersede its complaint restarted the clock on a still-unexpired deadline. And that approach is consonant with the apparent rationale for having the Affidavit of Merit deadline run from the filing of an Answer: *i.e.,* to ensure that motions to dismiss, if any, have been decided, the causes of action are settled, and any necessary discovery preliminary to the filing of the Affidavit can be noticed and taken.

## II.   Summary Judgment, AOM Statutory Scheme, and Undisputed Facts

### A.   Legal Standard on Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that summary judgment[4] should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138

---

[4]   Defendant Picerno-Jones moves separately "to dismiss" the complaint as against herself, citing no particular Federal Rule. Her nomenclature may be inapt. She has already answered the 2AC (*see* ECF no. 70), and her motion, which contains a "Statement of Material Facts," parallels the motion for summary judgment filed by the other Medical Defendants.

(3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

**B.    The AOM Statutory Scheme**

In an action alleging professional malpractice, New Jersey requires an Affidavit of Merit ("AOM"). *See* AOM Statute, N.J. Stat. Ann. §§ 2A:53-26 to 29.[5] Generally within 120 days after the defendant files an answer, the malpractice plaintiff must file such an affidavit from an appropriate licensed professional. That AOM must state, to a reasonable probability, that the defendant's conduct fell short of accepted standards in the relevant profession.

**1. General AOM standards**

The AOM Statute was passed in 1995 as part of a tort reform package designed to balance two competing policies: weeding out frivolous lawsuits early, while ensuring that meritorious claims are heard. *Ferreira v. Rancocas Orthopedic Assocs.*, 836 A.2d 779, 782-83 (N.J. 2003).

> The core purpose underlying the [AOM Statute] is to require plaintiffs ... to make a threshold showing that their claim is meritorious, in order that meritless lawsuits readily could be identified at an early stage of litigation. Importantly, there is no legislative interest in barring meritorious claims brought in good

---

[5]    A federal court must apply the AOM requirement to malpractice claims under New Jersey law, whether under diversity jurisdiction or the Federal Tort Claims Act. *See Kindig v. Gooberman*, 149 F. Supp. 2d 159, 163 (D.N.J. 2001) (diversity; citing *Chamberlain v. Giampapa*,  210 F.3d 154, 157 (3d Cir. 2000)); *Fontanez v. United States*, 24 F. Supp. 3d 408, 411 (D.N.J. 2014) (Donio, U.S.M.J.) (FTCA case; citing *Staub v. United States*, No. 08-2061, 2010 WL 743926, at *2 (D.N.J. Mar. 3, 2010)). *A fortiori,* it applies to state law claims brought in their own right, pursuant to the Court's supplemental jurisdiction. 28 U.S.C. § 1367.

faith. Indeed, [t]he legislative purpose was not to create a minefield of hyper-technicalities in order to doom innocent litigants possessing meritorious claims.

*Ryan v. Renny,* 999 A.2d 427, 435–36 (N.J. 2010) (internal quotations and citations omitted).

An AOM is required in "all actions for damages based on professional malpractice," *Ryan,* 999 A.2d at 435, brought against "a licensed person in [that person's] profession or occupation," N.J. Stat. Ann. § 2A:53A-27.[6] The AOM Statute lists sixteen such professions and occupations. N.J. Stat. Ann. § 2A:53A-26. As relevant here, a covered professional includes "*a physician* in the practice of medicine or surgery pursuant to [N.J. Stat. Ann. § 45:9–1 to –58]; ... [and] *a registered professional nurse* pursuant to [N.J. Stat. Ann. § 45:11–23 to –67]." N.J. Stat. Ann. § 2A:53A-26(f), (i) (emphasis added).[7] Business organizations of licensed professionals are likewise covered. *See Martin v. Perinni Corp.,* 37 F. Supp. 2d 362, 366 (D.N.J. 1999).

The AOM Statute sets forth the basic AOM requirement as follows:

In any action for damages for personal injuries, wrongful death or property damage resulting from an alleged act of malpractice or negligence by a licensed person in his profession or occupation, the plaintiff shall, within 60 days following the date of filing of the answer to the complaint by the defendant, provide each defendant with an affidavit of an appropriate licensed person that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices. The court may grant no more than one additional period, not to exceed 60 days, to file the affidavit pursuant to this section, upon a finding of good

---

[6]    An action "based on professional malpractice" encompasses a claim, however designated, "if the claim's underlying factual allegations require proof of a deviation from the professional standard of care applicable to that specific profession." *Mulholland v. Thomas Jefferson Univ. Hosps.,* No. CIV.A. 09-4322 JAP, 2011 WL 3425282, at *4 (D.N.J. Aug. 4, 2011) (citing *Couri v. Gardner,* 801 A.2d 1134, 1141 (N.J. 2002)), *aff'd,* 491 F. App'x 300 (3d Cir. 2012).

[7]    Section 26 is reprinted in full in the Appendix at the end of this Opinion.

cause.

N.J. Stat. Ann. § 2A:53A-27.

The AOM from "an appropriate licensed person" must be furnished within 60 days after the filing of defendant's answer. The court, on a showing of good cause, may extend that deadline for an additional 60 days. N.J. Stat. Ann. § 2A:53A-27. The good cause standard is a forgiving one, and as a practical matter, the deadline is very often 120 days. *See Costa v. Cnty. of Burlington*, 566 F. Supp. 2d 360, 362 (D.N.J. 2008) (citing *Burns v. Belafsky*, 166 N.J. 466, 766 A.2d 1095, 1100-01 (2001)), and my own discussion of the deadline and the "good cause" extension in *Szemple v. Univ. of Med. & Dentistry of New Jersey*, __ F. Supp. 3d __, No. 10 cv 258, 2016 WL 542102 at *4–*6 (D.N.J. Feb. 8, 2016).

A plaintiff's failure to timely furnish an AOM from "an appropriate licensed person," unless excused by extraordinary circumstances, is grounds for dismissal of the complaint with prejudice. *See* N.J. Stat. Ann. § 2A:53A-29; *Palanque v. Lambert Wooley,* 774 A.2d 501, 505 (N.J. 2001).

## 2. Eligibility to be an affiant: Sections 27 and 41

Section 27 imposes the foundational requirement that the AOM be signed by an "appropriate licensed person." As discussed more fully *infra,* that means a person who holds the same class of professional license as the defendant. *See Hill Int'l, Inc. v. Atl. City Bd. of Educ.*, 106 A.3d 487, 499–504 (N.J. Super. Ct. App. Div. 2014)*, appeal granted,* 112 A.3d 589, 116 A.3d 1069 (N.J. 2015); *Szemple,* __ F. Supp. 3d at __, 2016 WL 542102 at *10–*11.

As to who may be an AOM affiant in a medical malpractice case, the current version of the AOM Statute imposes additional and quite specific rules. In understanding the archaeological layers of this scheme, some history is helpful.

N.J. Stat. Ann. § 2A:53A-27 ("Section 27") was originally enacted in

9

1995.[8] At that time, the general Section 27 affiant eligibility standard was the only one; it applied to all professional malpractice cases, medical and nonmedical alike. That general standard survives in the current version of Section 27, which provides that the "appropriate licensed person …

> executing the affidavit shall be licensed in this or any other state; have particular expertise in the general area or specialty involved in the action, as evidenced by board certification or by devotion of the person's practice substantially to the general area or specialty involved in the action for a period of at least five years.  The person shall have no financial interest in the outcome of the case under review, but this prohibition shall not exclude the person from being an expert witness in the case.

N.J. Stat. Ann. § 2A:53A-27.

Under that traditional Section 27 standard, there was room for cross-specialty AOMs in medical malpractice cases:

> In its original iteration, the statute broadly required that the affidavit be executed by an affiant who was "licensed" and had "expertise in the general area or specialty involved in the action, as evidenced by board certification or by devotion of the person's practice substantially to the general area or specialty involved in the action for a period of at least five years[.]" *L.* 1995, *c.* 139, § 2. Under that standard, a physician in one field was qualified to render an opinion with respect to the performance of a physician in another if their practices overlapped.

*Ryan,* 999 A.2d at 436 (citing *Burns v. Belafsky,* 166 N.J. 466, 480, 766 A.2d 1095 (2001)). Not any longer.

In 2004, the State legislature passed the New Jersey Medical Care Access and Responsibility and Patients First Act, *L.* 2004, *c.* 17. The 2004 Act was a so-called "tort reform" package, designed to address the "dramatic escalation in medical malpractice liability insurance premiums." *N.J. State Bar Ass'n v. State,* 902 A.2d 944, 951 (N.J. Super. Ct. App. Div.), *certif. denied,* 909 A.2d

---

[8]      Section 27 is reprinted in full in the Appendix at the end of this Opinion.

726 (2006).[9]

That 2004 Act included an amendment to Section 27, which now draws a distinction between medical malpractice cases and others:

> In the case of an action for medical malpractice, the person executing the affidavit shall meet the requirements of a person who provides expert testimony or executes an affidavit as set forth in section 7 of P.L.2004, c.17 [N.J. Stat. Ann. § 2A:53A-41].

N.J. Stat. Ann. § 2A:53A-27. As to medical malpractice cases, then, Section 27 refers the reader to a newly-enacted statutory section, N.J. Stat. Ann. § 2A:53A-41 ("Section 41").[10]

Section 41 sets a "kind-for-kind" standard of eligibility to be an AOM affiant, imposing various criteria depending on the level of specialization.

> In an action alleging medical malpractice, a person shall not give expert testimony or execute an affidavit pursuant to the provisions of P.L.1995, c. 139 [N.J. Stat. Ann. § 2A:53A-26 *et seq.*] on the appropriate standard of practice or care unless the person is licensed as a physician or other health care professional in the United States and meets the following criteria....

Immediately following the quoted passage is a lengthy statement of the necessary qualifications to be an AOM affiant. The drafting is convoluted, but the upshot has been summarized thus: Section 41 "generally requir[es] that the challenging expert be equivalently-qualified to the defendant." *Lomando v. United States,* 667 F.3d 363, 382–83 (3d Cir. 2011). *See also Ryan,* 999 A.2d at 436; *Nicholas v. Mynster,* 64 A.3d 536, 539 (N.J. 2013); *Buck v. Henry,* 25 A.3d 240 (N.J. 2011).

That Section 41 "kind-for-kind" rule applies differently to defendants in "three distinct categories ...

> (1) those who are specialists in a field recognized by the American Board of Medical Specialties (ABMS) but who are not board-certified in that specialty;
>
> (2) those who are specialists in a field recognized by the ABMS and

---

[9]     Here, *N.J. State Bar* was quoting the preamble to the 2004 bill, reprinted in the Appendix at the end of this Opinion.

[10]     Section 41 is reprinted in full in the Appendix at the end of this Opinion.

who are board-certified in that specialty; and

(3) those who are 'general practitioners.'"

*Nicholas v. Mynster*, 64 A.3d 536, 548 (N.J. 2013) (quoting *Buck v. Henry*, 25 A.3d 240, 247 (N.J. 2011); line breaks added by *Nicholas*).

The first category (non-board-certified specialists), covered by Section 41(a), is not involved in this case, so I do not discuss it. Our case involves only the second and the third categories: board-certified specialists and general practitioners.

The second category, covered by Section 41(a), applies to a defendant physician who is board-certified in a specialty recognized by the American Board of Medical Specialties (ABMS) or the osteopathic equivalent. Where the defendant is board-certified and "the care or treatment at issue involves that board specialty," *id.*, the class of eligible AOM affiants is correspondingly restricted.

For a defendant physician board-certified in an ABMS specialty (like three of the physicians here), an AOM affiant must meet two eligibility requirements:

First, the AOM affiant must be board-certified in "the same specialty or subspecialty" as the defendant doctor, *and*

Second, the AOM affiant must possess one or both of the following credentials:

"[1] [the affiant] must *either* be credentialed by a hospital to treat the condition at issue [citing § 41(a)(1)], *or*

[2] be board-certified in the same specialty in the year preceding 'the occurrence that is the basis for the claim or action' [quoting § 41 (a)(2)]."

*Nicholas,* 64 A.3d at 547–48 (emphasis, numbers and line breaks added).[11]

---

[11]   It is well settled that these Section 41(a)(1) and (a)(2) requirements are additions, not alternatives, to the requirement that the affiant and the defendant doctor be board-certified in the same specialty. *See Lomando,* 667 F.3d at 382–83; *Nicholas,* 64 A.3d at 548–49.

Recognizing that my nomenclature is oversimplified, I will call this post-2004, Section 41(a) requirement the "same specialty" rule. The rule is a strict one. In *Nicholas,* for example, the state Supreme Court recognized that post-2004, an expert was not an eligible AOM affiant merely because the expert and the defendant doctor practiced in overlapping fields. *Id.* at 539, 544, 548. Section 41(a), *Nicholas* held, required that they be board-certified in the identical ABMS specialty. It reversed the denial of summary judgment to the defendants, because "[t] he trial court failed to apply the equivalency requirements of the 2004 Act." *Id.* at 539.

The third category, which is governed by Section 41(b), covers a general practitioner, *i.e.,* a non-specialist. In a case against such a general practitioner, Section 41(b) imposes a lower standard of eligibility for an AOM affiant. It requires that, in "the year immediately preceding" the alleged malpractice, the AOM affiant must have "devoted a majority of [the affiant's] professional time" to (1) active clinical practice as a general practitioner, or active clinical practice that includes the medical condition or procedure at issue; *or* (2) instructing students in an accredited institution "in the same health care profession" as the defendant; *or* (3) both.[12] N.J. Stat. Ann. § 2A:53A-41(b); *see also Lomando,* 667 F.3d at 387 n.28; *Ryan,* 999 A.2d at 440. (This is a summary. Section 41(b) is discussed further *infra,* and is quoted in full in the Appendix.)

### C.    Undisputed Facts Relevant to the Motions

As to many of the facts relevant to the Affidavit of Merit issue, there is no dispute. I mean that first as a matter of procedure: the Plaintiff has not filed an affidavit, a response to the defendants' statements of material facts, or her own counterstatement of material facts.[13] *See* Fed. R. Civ. P. 56(c); Loc. R. 56.1(a).

---

[12]     Presumably, if clinical practice and instruction overlap, a doctor could be said to have devoted a "majority" of his or her professional time to "both." But given that either will suffice, the separate designation of "both" seems superfluous.

[13]     To her letter brief, Plaintiff attaches a February 2, 2014, report by a forensic pathologist and neuropathologist, Dr. Hua. This, however, is also submitted as Exhibit

More importantly, I mean it as to substance: the procedural history, the specialties of the professionals involved, the documents that were or were not furnished to the defendants by the Plaintiff, and the contents of the Hua Report that she did furnish, are clear. Certain allegations as to Dr. Hua's qualifications and practice, however, are unsupported by affidavits or evidence, as will be discussed later. *See* Section III.C, *infra*.

The relevant facts, taken from the submissions and the docket of this case, are as follows.

### *Malpractice Alleged in Second Amended Complaint*

The 2AC, which alleges causes of action sounding in medical malpractice against the Medical Defendants, was filed on November 26, 2012. (2AC, ECF no. 20; *see also* MPSMF ¶ 1; PJSMF ¶ 1[14])

The 2AC charges that "[d]efendants were negligent and in violation of the acceptable and reasonable standard of care." In particular—

> Eli Endl was denied/deprived of proper and necessary medical care and attention violative of the standard of care, specifically as follows:

1. Failing to provide a medical workup following Endl's documented March 21, 2010 complaint of chest cavity pain;
2. Misdiagnosing bronchitis when Endl suffered from congestive heart failure;
3. Misdiagnosing kidney stone-related pain and respiratory infection;
4. Failing to diagnose potential aortic dissection;
5. Failing to diagnose Marfanoid symptoms;
6. Failing to timely treat a dissecting aortic aneurysm;
7. Failing to address prior diagnoses of schizophrenia and mood disorder;
8. Failing to properly diagnose several pain symptoms; and
9. Failing to insure that Endl was properly medicated.

---

M (ECF no. 74-5 at 17–23) to the Medical Defendants' summary judgment motion, so no issue of authenticity is raised. I discuss Dr. Hua's report below.

[14]   "MPSMF" refers to the Medical Defendants' Statement of Material Facts, found in their brief, ECF no. 73-2 at 3. "PJSMF" refers to Nurse Picerno-Jones's Statement of Material Facts, found in her brief, ECF no. 72 at 6. Both are properly supported by citations to the record.

(2AC ¶ 23; MPSMF ¶ 3))

### *Specialties and Practice Areas of Medical Practitioner Defendants*

Answers to standard interrogatories, furnished in April and May of 2013, identify the medical specialty or practice area of each of the defendant physicians:

| | |
|---|---|
| John Godinsky, MD | —general practitioner |
| Sharmalie Perera, MD | —board-certified in internal medicine and pulmonary disease |
| Alan Kaye, MD | —board-certified psychiatrist |
| Anasuya Salem, MD | —board-certified psychiatrist |

(ECF no. 74-4; *see also* MPSMF ¶ 5)

They also identify the practice area of each of the other Medical Defendants:

| | |
|---|---|
| David Maxey, PhD | —licensed psychologist |
| Veronica Nendze | —Registered Nurse (RN) |
| Maria Delgado | —RN |
| Bernice Picerno-Jones | —RN |
| Theresa Boblick | —Licensed Practical Nurse (LPN) |

(ECF no. 74-4; *see also* MPSMF ¶ 5)

### *Demands for Affidavit of Merit*

On March 13, 2014, this Court filed an order and opinion granting in part and denying in part motions to dismiss the 2AC. (ECF nos. 66, 67) I denied the motion to dismiss for failure to furnish an Affidavit of Merit because the Medical Defendants had not yet answered the 2AC, so the period within which to file an Affidavit of Merit had not yet begun to run. (ECF no. 66 at 17–20)

On March 19, 2014, the Medical Defendants other than Picerno-Jones filed an answer to the 2AC. (ECF no. 69; *see also* MPSMF ¶ 4) Their answer stated that "pursuant to N.J.S.A. 2A:53A-27, these Defendants demand that within sixty (60) days following the date of this Amended Answer, Plaintiffs

serve and file an Affidavit of Merit." (ECF no. 69 at 11; *see also* MPSMF ¶ 4)
That Answer to the 2AC confirms the defendants' professions and medical
specialties as described in the interrogatory answers. (ECF no. 69 at 3, Answer
¶¶ 16–18)

On March 21, 2014, defendant Picerno-Jones filed a separate answer to
the 2AC. (ECF no. 70) Picerno-Jones's answer made demand "that the plaintiff
provide an Affidavit of Merit within sixty (6) days in accordance with <u>N.J.S.A.</u>
2A:53A-26–29." (ECF no. 70 at 9; *see also* PJSMF ¶ 5)

### *Report of Dr. Hua*

Plaintiff did not furnish anything in the way of an Affidavit of Merit after
the answers to the 2AC were filed. (MPSMF ¶ 6; PJSMF ¶ 6) Instead, Plaintiff
rests on an expert report of Dr. Zhongxue Hua, dated February 2, 2014, and
served on February 6, 2014, before the Medical Defendants filed their answers.
("Hua Rpt", ECF no. 74-5 at 18–23; *see also* MPSMF ¶ 7)

The cover letter from counsel for Plaintiff states that Dr. Hua is "an
expert witness who will be called to testify at the time of Trial as to all matters
contained in his report." (ECF no. 74-5 at 18) Dr. Hua is well-credentialed as a
Forensic Pathologist and Neuropathologist. He is current employed as a
forensic pathology and neuropathy consultant, and as a forensic pathologist in
Rockland County, New York. His c.v. reveals experience solely in those
particular fields. His teaching experience and his publications are in those
fields as well. (ECF no. 74-5 at 21–23)

Dr. Hua's conclusions were based on review of (1) his own 2010 autopsy
report; (2) a 2010 toxicology report by Dr. George Jackson; and (3) jail medical
records from 02/13/2009 to 03/24/2010. (Hua Rpt 1)

Dr. Hua noted a history of schizophrenia, mood disorder, substance
abuse, and other problems. The autopsy examination revealed Marfanoid
physical features;[15] chest fluid accumulation; an enlarged heart with fibrous

---

[15]     The Mayo Clinic website has no separate entry for "Marfanoid physical
features," but describes Marfan syndrome thus:

pericarditis; and an ongoing aortic dissection.[16] Those conditions, wrote Dr. Hua, were obvious and should have been diagnosed during Endl's 13 months in jail. (Hua Rpt 1)

Dr. Hua then focused on perceived shortcomings in Endl's treatment from March 21 through March 24, 2010. He concluded:

1.  At 9 pm on 3/21/2010, nurse Bernice Picerno-Jones document that "inmate c/o chest cavity pain demonstrating from his shoulder down past his abdomen" and Mr. Endl "was given Tylenol 650 mg P.O." only; she did not even use common sense that a layperson would use let alone a nurse;

2.  On 3/22/2010, the jail records indicated that Mr. Endl had severe pain symptoms, ranging from "stomach pain", "kidney pain" to

---

Marfan syndrome is an inherited disorder that affects connective tissue — the fibers that support and anchor your organs and other structures in your body. Marfan syndrome most commonly affects the heart, eyes, blood vessels and skeleton.

People with Marfan syndrome are usually tall and thin with disproportionately long arms, legs, fingers and toes. The damage caused by Marfan syndrome can be mild or severe. If your aorta — the large blood vessel that carries blood from your heart to the rest of your body — is affected, the condition can become life-threatening.

Treatment usually includes medications to keep your blood pressure low to reduce the strain on your aorta. Regular monitoring to check for damage progression is vital. Many people with Marfan syndrome eventually require preventive surgery to repair the aorta.

www.mayoclinic.org/diseases-conditions/marfan-syndrome/home/ovc-20195407

[16]   The Mayo Clinic website describes an aortic dissection thus:

An aortic dissection is a serious condition in which the inner layer of the aorta, the large blood vessel branching off the heart, tears. Blood surges through the tear, causing the inner and middle layers of the aorta to separate (dissect). If the blood-filled channel ruptures through the outside aortic wall, aortic dissection is often fatal.

Aortic dissection is relatively uncommon. The condition most frequently occurs in men in their 60s and 70s. Symptoms of aortic dissection may mimic those of other diseases, often leading to delays in diagnosis. However, when an aortic dissection is detected early and treated promptly, the chance of survival greatly improves.

www.mayoclinic.org/diseases-conditions/aortic-dissection/basics/definition/con-20032930

"chest pain". Dr. David Maxey documented that Mr. Endl's "intention to kill himself or others if not seen for treatment of his stomach pain." Both Drs. David Maxey and Alan Kaye documented that Mr. Endl "spent the majority of the last night without sleep". Dr. Anasuya Salem noted Mr. Endl's statement "I am in constant pain". Drs. Perera and Godinsky evaluated the pain symptoms without a simple chest X-ray examination; his enlarged heart (642 grams) and ongoing aortic dissection were not suspected, diagnosed or surgically treated.

3.  Starting on 3/24/2010, Mr. Endl demonstrated symptoms of congestive heart failure, with "blood tinged sputum", "shortness of breath" and "worse when I lay down". Mr. Endl had autopsy evidence of congestive heart failure, however, Mr. Endl was diagnosed and treated for bronchitis in the jail;

4.  During the last four days of his life, his ongoing aortic dissection could and should have been medical[ly] diagnosed and surgically treated. His unfortunate sudden death could and should have been prevented;

5.  During the last several days of his life, per jail records, Mr. Endl received multiple medications (Motrin, Risperdal and Ativan). However, none of the medications was detected in the postmortem toxicology ("double screen"). A negative toxicology result[] indicated that Mr. Endl was not given/taken the alleged medications properly.

(Hua Rpt 2)

Explicitly invoking his expertise as a board-certified forensic pathologist and neuropathologist, Dr. Hua identified the cause of death as "a dissecting aortic aneurysm due to marked cardiomegaly." He stated that preexisting diseases (Marfanoid physical features, enlarged heart and significant chest fluid accumulation) were medically obvious but had been ignored. "During the last four days [of Endl's life], a continuous and repeated ignoring of his typical pain symptoms from an aortic dissection was a lack of common medical sense and a significant deviation from the standards of medical practice. There was a failure of simple common sense. The above opinions are within a reasonable degree of medical certainty." (Hua Rpt 2)

III.   **ANALYSIS**

Plaintiff acknowledges imperfect compliance with the AOM Statute, but invokes the doctrine of "substantial compliance." *See Galik v. Clara Maas Med. Ctr.*, 771 A.2d 1141 (N.J. 2001). The parties' dispute comes down to three essential questions:

(1) If Dr. Hua's unsworn Report is not precisely an Affidavit of Merit, can its deviations from form nevertheless be excused? (*See* Section III.A, *infra*)

(2) As to the three board-certified Medical Defendants, is Dr. Hua an ineligible affiant under Section 41 because he is not board-certified in the same specialty? (*See* Section III.B, *infra*.)

(3) As to all of the Medical Defendants, does the Hua Report satisfy the other procedural and substantive requirements of the AOM Statute? (*See* Sections III.C, D, & E, *infra*.)[17]

A.   **Substantial Compliance as to Form**

The Hua Report is not designated an Affidavit of Merit. Indeed, it is not an affidavit at all; it is not sworn or otherwise certified. It is a pathologist's opinion as to cause of death. It is explicitly offered as the report of an expert who will testify at trial. Although this Report does not meet the formal requisites of an Affidavit of Merit, I conclude that, under the doctrine of "substantial compliance," it may nevertheless be accepted as the functional equivalent. And considered as such, it is timely; it was furnished well before the Medical Defendants filed their Answers to the 2AC.

The Affidavit of Merit statute, it is said, was not enacted to "bar[] meritorious claims," or to "create a minefield of hyper-technicalities." *Ryan*, 999 A.2d at 435–36. Perhaps so. Its effect, however, is harsh—ordinarily, dismissal with prejudice of claims, irrespective of their merit, when the statute

---

17   This sequential approach—first considering the AOM's deviations from form (Question 1), and then its substantive adequacy (Questions 2 and 3)—is adapted from *Galik*. In the course of the analysis, I consider certain other contentions, but the eligible-affiant issue lies at the crux of the defendants' substantive objections.

has not been complied with.

"[T]o temper the draconian results of an inflexible application of the statute," the New Jersey Supreme Court has announced that the courts should accept AOMs where there has been "substantial compliance" with the statute. *See Ferreira,* 836 A.2d at 783; *Hubbard v. Reed,* 774 A.2d 774 A.2d 495, 500 (N.J. 2001). A finding of substantial compliance rests on five factors:

> (1) The lack of prejudice to the defending party; (2) a series of steps taken to comply with the statute involved; (3) a general compliance with the purpose of the statute; (4) a reasonable notice of petitioner's claim; and (5) a reasonable explanation why there was not strict compliance with the statute.

*Ferreira,* 836 A.2d at 783. I apply those five factors.

There is little if any prejudice to the Medical Defendants. The Hua Report was served in February 2014, while their motion to dismiss the 2AC was pending. That, as I found in my earlier Opinion, was months in advance of what turned out to be the AOM deadline.

Plaintiff's counsel has taken steps to comply with the AOM requirement. He has furnished medical records and turned over the Hua Report, which states the substance of Plaintiff's malpractice claims. He did so well in advance of the 120 day deadline, as I have found.

The Hua Report is generally directed to the informational and screening concerns of the AOM Statute. The Report states the cause of death and states an opinion as to the failings of the medical personnel at the prison. It specifically names the four defendant physicians (Godinsky, Perera, Kaye and Salem), Dr. Maxey, and Nurse Picerno-Jones, though not the three other nurses who are now named as defendants. It places the defendants on reasonable notice of the nature of the medical malpractice claims. And it purports to establish the relevant standard of care. True, it does not parrot the words of the AOM Statute: "that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices." N.J. Stat. Ann. § 2A:53A-27. It

20

does, however, state that the defendants' acts showed "a lack of common medical sense and a significant deviation from the standards of medical practice," and that Dr. Hua's opinions had been stated "within a reasonable degree of medical certainty." (Hua Rpt 2) The sense is substantially similar to what is required by Section 27.

As to the justification for failure to comply, the Plaintiff's showing is equivocal. Chiefly, counsel states that discovery has proceeded based on the Hua Report, without objection and without a *Ferreira* conference (*see* Section III.E, *infra*). Defendants, however, have been very clear about their intent to insist on compliance with the AOM statute. Dr. Hua's report was proffered as an ordinary expert report of an anticipated trial witness. To take discovery from such a designated expert would be the usual course; nothing about conducting such discovery implies a concession that the Hua Report should be considered an Affidavit of Merit. I note also that, in response to the motions to dismiss, Plaintiff's counsel took the position that her claims raised matters of "common knowledge," not requiring an expert witness or an AOM at all. I will, however, accept counsel's current representation that this Report is intended as a good faith effort to comply with the requirement of an expert's AOM.

There is case law support for the proposition that, under such circumstances, a court may excuse deviations from the requirements (at least the formal requirements) of an AOM.

For example, in *Galik v. Clara Maas Med. Ctr.,* 771 A.2d 1141 (N.J. 2001), a medical malpractice plaintiff had, in the course of pre-complaint settlement negotiations, provided the defendant's insurer with relevant medical records and reports by a physician stating that her treatment constituted a substantial deviation from the standard of medical care. After the complaint had been filed and answered, the plaintiff served an actual affidavit of merit, (seemingly, a sworn version of the doctor's reports), but only after the 120-day deadline had expired. That, said the trial court, merited dismissal for failure to comply with the AOM requirements. The New Jersey Supreme Court reversed that dismissal.

The State Supreme Court accepted that the actual AOM was filed too late. The only submission before the AOM deadline, then, consisted of the doctor's reports. As a result, the question before the court was whether the reports, despite being unsworn and uncertified, "substantially complied" with the requirement of filing a timely AOM. 771 A.2d at 1147–48.

The New Jersey Supreme Court concluded that this was a "classic substantial compliance case" under the five-factor test stated above. *Id.* at 1151. The reports had been submitted timely—in fact quite early, in the course of pre-complaint settlement negotiations. The plaintiff's efforts to forward the report and relevant medical records constituted good faith efforts to comply with the statute, and served its underlying purpose of ensuring that defendants were on notice of a nonfrivolous claim. "[P]laintiff's counsel explained that he believed that he had exceeded his obligation under the Affidavit of Merit statute. At least in part, because his actions were taken in previously uncharted waters, that explanation was reasonable." *Id.* at 1152.

Fifteen years after *Galik,* those waters are no longer quite so "uncharted," and there is less excuse for imperfect compliance. Nevertheless, Dr. Hua's report is a report by a physician that states the basis for the Plaintiff's claims and opines that they are meritorious. Dr. Hua implied, and Plaintiff's counsel explicitly stated, that the Report was offered to notify the Medical Practitioner defendants of the testimony that Dr. Hua is willing to give under oath. The Report is itself unsworn, but that formal defect could easily be remedied by amendment: specifically, the addition of a one-line *jurat.*

Neither is it fatal that the Report does not parrot the precise language of Section 27, which requires a "reasonable probability that the care ... fell outside acceptable professional or occupational standards...." *Galik* suggests that the substance of that standard is adequately conveyed by the Hua Report's statement "to a reasonable degree of medical certainty" that the Medical Defendants' care had constituted a "significant deviation from the standards of medical practice." *See* 771 A.2d at 1152 ("substantial deviation"

language sufficiently complied with AOM Statute's "reasonable probability" mandate); *see also Mayfield v. Comm. Med. Assoc.,* 762 A.2d 237, 243–44 (App. Div. 2000) ("significant deviation from the standard of medical care").

I will therefore accept Dr. Hua's report as the functional equivalent of an Affidavit of Merit, despite its being not formally designated as an AOM, not being sworn, and not using the precise words of the AOM Statute. My earlier Opinion implies that the Report was timely, because the 120-day period had not yet begun running when it was turned over to the defense.

As in *Galik,* however, once formal matters are disposed of, "there remains the issue of whether those reports are substantively adequate" as to each defendant. 771 A.2d at 1152. Having found the Hua Report to be the functional equivalent of a timely-served AOM, I next consider whether it meets the Statute's standards of eligibility for an AOM affiant.

## B.  Specialist Defendants (Section 41(a))

The Hua Report is challenged under the Section 41(a) "same specialty" rule, because Dr. Hua, a forensic pathologist, is not equivalently credentialed to the Medical Defendants. Here, I focus on the three Medical Defendants who are identified as specialists:

> Sharmalie Perera, MD   —board-certified in internal medicine and pulmonary disease
>
> Alan Kaye, MD   —board-certified psychiatrist
>
> Anasuya Salem, MD   —board-certified psychiatrist

As discussed more fully above, *see* Section II.B.2, the "same specialty" rule of Section 41(a), N.J. Stat. Ann. § 2A:53A-41(a), applies to a defendant doctor who, at the time of the alleged malpractice, (1) was board-certified in a specialty or subspecialty recognized by the American Board of Medical Specialties ("ABMS"); and (2) was rendering care within that specialty.

Dr. Perera was, at the relevant time, board-certified in internal medicine and pulmonary disease, and Drs. Kaye and Salem were board-certified in psychiatry. Internal Medicine and Psychiatry are among the approved specialty certificates in which ABMS Member Boards can offer certification. Pulmonary disease is an ABMS-approved subspecialty of internal medicine. www.abms.org/member-boards/specialty-subspecialty-certificates/ (summary list of ABMS specialties and subspecialties) (visited March 27, 2016). (The ABMS *Guide to Medical Specialties*, a more complete description, may be downloaded at www.abms.org/media/84812/guide-to-medicalspecialties_05_2015-2.pdf.)

Even where the defendant doctor happens to be a specialist, however, the court must consider "whether the treatment that is the basis of the malpractice action 'involves' the physician's specialty." *Buck*, 24 A.3d at 248. If not, the defendant physician will be deemed to have acted, not as a specialist, but as a general practitioner. In such a case, Section 41(b)'s less stringent eligibility requirements for the general practice AOM affiant will apply. *Id.*

Plaintiff contends that these three doctors were not practicing their specialties, but acting as general practitioners, when they treated Mr. Endl.

As to Dr. Perera, Plaintiff says that Endl's symptoms—"stomach pain," "kidney pain," or "chest pain"—are not associated with the subspecialty of pulmonary disease.[18] Chest pain, I suppose, could be; and Dr. Hua states that "at the jail" an unidentified person or persons mistook Endl's congestive heart failure for bronchitis, a (mis)diagnosis that could fall within the pulmonary subspecialty. (Hua Rpt at 2) More importantly, though, Plaintiff fails to deal with Perera's primary specialization, which is in internal medicine. Dr. Hua, a

---

[18]

**Pulmonary Disease**

An Internist (Pulmonologist) who treats diseases of the lungs and airways. The specialist diagnoses and treats cancer, pneumonia, pleurisy, asthma, occupational and environmental diseases, bronchitis, sleep disorders, emphysema, and other complex disorders of the lungs.

ABMS *Guide to Medical Specialties, supra*, at 27.

pathologist writing *post mortem* with the benefit of autopsy results, identified these forms of pain as symptoms of an ongoing aortic dissection, a relatively uncommon condition. Any diagnosis or treatment of those listed symptoms in a living patient would seem to fall squarely within the practice of a board-certified internist. An internist's practice consists of, *inter alia,* "diagnosis and treatment of cancer, infections, and diseases affecting the heart, blood, kidneys, joints, and the digestive, respiratory, and vascular systems."[19] I therefore do not accept Plaintiff's conclusion that Dr. Perera "must have treated [Endl] as a general practitioner." (Pl. Br., ECF no. 76 at 16)[20]

Drs. Kaye and Salem, both board-certified psychiatrists,[21] are not the subject of very specific allegations. For all that can be gleaned from Dr. Hua's Report, Kaye and Salem were very likely consulted because of Endl's "long history of schizophrenia, mood disorder, [and] prior substance abuse." (Hua Rpt at 1) The Second Amended Complaint alleges "Failure to address prior

---

[19]

**Internal Medicine**

An Internist is a personal physician who provides long-term, comprehensive care in the office and in the hospital, managing both common and complex illnesses of adolescents, adults, and the elderly. Internists are trained in the diagnosis and treatment of cancer, infections, and diseases affecting the heart, blood, kidneys, joints, and the digestive, respiratory, and vascular systems. They are also trained in the essentials of primary care internal medicine, which incorporates an understanding of disease prevention, wellness, substance abuse, mental health, and effective treatment of common problems of the eyes, ears, skin, nervous system, and reproductive organs.

ABMS *Guide to Medical Specialties, supra,* at 24.

[20]     Even if all or part of Dr. Perera's care were found to constitute general practice, an AOM would nevertheless be required, and summary judgment would be appropriate under the standards of Section 41(b). *See* Section III.C, *infra.*

[21]

**Psychiatry**

A Psychiatrist specializes in the evaluation and treatment of mental, addictive, and emotional disorders such as schizophrenia and other psychotic disorders, mood disorders, anxiety disorders, substance-related disorders, sexual and gender identity disorders, and adjustment disorders.

ABMS *Guide to Medical Specialties, supra,* at 51.

diagnosis of schizophrenia and mood disorder." (2AC ¶ 23(g)) In short, it is difficult to discern what Kaye and Salem did, let alone did wrong, when they saw Endl. To the extent these are allegations of psychiatric malpractice, however, they are dismissed for failure to file an appropriate AOM by a like-credentialed psychiatrist.

Plaintiff also alleges medical malpractice of a more general, non-psychiatric nature. Kaye is said to have noted that Endl had not slept; Salem noted Endl's complaint of being "in constant pain." (Hua Rpt at 2) Lack of sleep and complaints of physical pain would of course be properly noted in the course of psychiatric counseling or diagnosis. (Indeed, it was a psychologist, Dr. Maxey, who reported that Mr. Endl had threatened to kill himself or others if his stomach pain was not treated. (Hua Rpt at 2)) A general practitioner, however, or a physician in virtually any specialty, would also be bound to make note of such a complaint. Plaintiff alleges that any doctor, specialist or not, who failed to follow up such a complaint with a proper diagnosis would be guilty of malpractice.

For example, in *Jorden v. Glass*, No. 09 cv 1715, 2010 WL 786533 (D.N.J. Mar. 5, 2010) (Schneider, U.S.M.J.), a psychiatrist conducting a clinical drug trial allegedly failed to recognize or treat the symptoms of a heart attack. That lapse, said Judge Schneider, did not involve the doctor's psychiatric specialty. Therefore, although an AOM would be required, the AOM affiant was not required to be a psychiatrist. I agree with Judge Schneider that if the care rendered by Dr. Kaye or Dr. Salem were found to be in the realm of general practice, then the AOM would not have to come from a psychiatric specialist. I consider that narrow issue separately in the following section. *See* Section III.C, *infra*.

To the extent the defendants are board-certified specialists, practicing their specialties, Section 41 requires that any AOM affiant be board-certified in the same specialty. Dr. Hua is not. According to his c.v., attached to the Hua Report, Dr. Hua is a diplomate of the American Board of Pathology (a Member Board of ABMS). Dr. Hua's fields are forensic pathology, neuropathology, and

anatomic pathology.[22] These, and these alone, constitute his area of practice. All of his employment, past and present, has been in those fields. He has served as a forensic pathologist, a County or City Medical Examiner, and like positions. His publications are virtually all in that field as well. In short, Dr. Hua both specializes and practices in a specialty completely separate from the specialties in which Drs. Perera, Kaye, and Salem are board-certified.

Plaintiff stresses that Dr. Hua is well situated by experience and training to judge the cause of death and other pertinent issues. Counsel (without any supporting affidavit) opines that Dr. Hua has seen these medical conditions

---

[22] According to ABMS, a "diplomate" is a "physician who has met all the requirements for certification and has passed the certifying examination given by an ABMS Member Board." http://www.abms.org/about-abms/faqs/#Boards. The ABMS descriptions of Dr. Hua's specializations are as follows:

**Pathology**

A Pathologist deals with the causes and nature of disease and contributes to diagnosis, prognosis, and treatment through knowledge gained by the laboratory application of the biologic, chemical, and physical sciences. This specialist uses information gathered from the microscopic examination of tissue specimens, cells and body fluids, and from clinical laboratory tests on body fluids and secretions for the diagnosis, exclusion, and monitoring of disease.

ABMS *Guide to Medical Specialties*, *supra*, at 38.

**Pathology - Forensic**

A Forensic Pathologist is expert in investigating and evaluating cases of sudden, unexpected, suspicious, and violent death as well as other specific classes of death defined by law. The Forensic Pathologist serves the public as coroner or medical examiner, or by performing medicolegal autopsies for such officials.

ABMS *Guide to Medical Specialties*, *supra*, at 40.

**Neuropathology**

A Neuropathologist is expert in the diagnosis of diseases of the nervous system and skeletal muscles and functions as a consultant primarily to Neurologists and Neurosurgeons. This specialist is knowledgeable in the infirmities of humans as they affect the nervous and neuromuscular systems, be they degenerative, infectious, metabolic, immunologic, neoplastic, vascular, or physical in nature.

ABMS *Guide to Medical Specialties*, *supra*, at 40.

"dozens, if not hundreds," of times, and is familiar with treatment options. But even if I disregard the lack of an affidavit and assume that Dr. Hua's expertise overlaps with that of the defendant doctors, I am not free to disregard the Section 41(a) "same specialty" rule as to board-certified physicians.

The case law is clear that a mere overlap in expertise between the affiant and the defendant doctor is not sufficient. *See, e.g., Ryan,* 999 A.2d at 436; *Nicholas, supra.* Nor can the "same specialty" requirement be bridged by evidence, however, convincing, that the affiant is well qualified to judge the medical issues. *Nicholas,* for example, involved allegations of malpractice in the treatment of carbon monoxide poisoning. The plaintiff proffered the AOM of a physician who, on the face of it, was well qualified to opine: he was "board-certified in internal and preventive medicine and specialized in hyperbaric medicine, including the use of hyperbaric oxygen in the treatment of carbon monoxide poisoning." *Id.* The two defendant physicians who treated plaintiff for carbon monoxide poisoning, however, were board-certified in emergency medicine and family medicine. 64 A.3d at 539. The plaintiff's expert, however qualified, was not board-certified in the same specialties as the defendant doctors. Exclusion of the expert's AOM, said *Nicholas,* was dictated by a plain textual reading of Section 41.

I, like those state judges, must apply the words of a statute as written, except in rare cases where "absurd results" and "'the most extraordinary showing of contrary intentions' justify a limitation on the 'plain meaning' of the statutory language." *First Merchants Acceptance Corp. v. J.C. Bradford & Co.,* 198 F.3d 394, 402 (3d Cir. 1999) (quoting *Garcia v. U.S.,* 469 U.S. 70, 75, 105 S. Ct. 479 (1984)); *see also Thorpe v. Borough of Thorpe,* 770 F.3d 255, 263 (3d Cir. 2014), *cert. denied,* 136 S. Ct. 84 (2015). The results here, however harsh, do not seem to be at odds with the legislative intent.

Section 41(a) requires explicitly that the AOM affiant and the defendant doctors be board-certified in the same specialty. They are not. I therefore have no choice but to grant the summary judgment motion of Dr. Perera to the

extent that Plaintiff is alleging malpractice as an internist, and of Drs. Kaye and Salem to the extent that Plaintiff is alleging psychiatric malpractice.

## C.    General Practitioners (Section 41(b))

The third category of medical defendants under Section 41 consists of "general practitioners." *See* N.J. Stat. Ann. § 2A:53A–41(b); *Buck,* 25 A.3d at 247. Dr. Godinsky is designated without objection as a general practitioner, and would clearly fall under that Section 41(b) category. As to the other three physicians, the picture is murkier.

As relevant here, Section 41(b) requires that the AOM affiant,

> during the year immediately preceding the date of the occurrence that is the basis for the claim or action, shall have devoted a majority of his professional time to:
>
> > (1) active clinical practice as a general practitioner; or active clinical practice that encompasses the medical condition, or that includes performance of the procedure, that is the basis of the claim or action....

N.J. Stat. Ann. § 2A:53A–41(b)(1).[23]

Here, my analysis is hampered by the lack of any affidavit in response to the summary judgment motion. I might try to infer from Dr. Hua's c.v. how he spent "the majority of his professional time" in the year preceding March 25, 2010, the date of Mr. Endl's death, but I would be guessing. I have nothing before me permitting an inference that a specialty in anatomical pathology necessarily entails "active clinical practice" encompassing the medical conditions at issue here, an issue as to which the case law gives little guidance. A summary judgment motion cannot be defeated by speculation; at a minimum, some sort of affidavit or evidence is required.

I therefore will grant the motion for summary judgment as to Dr. Godinsky. Also, on this alternative Section 41(b) ground, I grant summary

---

[23]    There is no claim that Dr. Hua satisfies the alternative, teaching-based requirement of Section 41(b)(2).

judgment as to Drs. Perera, Kaye, and Salem, to the extent they are sued for acts and omissions that do not lie within their specialties.

This part of my ruling, however, is for now without prejudice. Within 30 days, Plaintiff may, if she wishes, submit an affidavit from Dr. Hua in opposition to summary judgment (*not* an additional Affidavit of Merit, which would be untimely), explaining how Dr. Hua meets the Section 42(b) eligibility requirements to be a general practice affiant against Drs. Godinsky, Perera, Kaye, and Salem. Those defendants may, if they wish, file a response within 15 days thereafter. No replies will be entertained. Should no such submission be received within 30 days, this part of my order will become with-prejudice.

A word about this unusual procedure: I am not in the habit of giving losers of summary judgment motions a second chance to submit affidavits. Here, however, the ramifying alternatives under the AOM scheme might make Plaintiff's failure to anticipate every eventuality understandable, if not wholly excusable. The New Jersey Supreme Court has twice recognized as much, and relaxed the statutory standards in light of the "confusion" sown by this convoluted statutory scheme. *See Buck v. Henry, supra*; *Paragon Contractors, Inc. v. Peachtree Condo. Ass'n*, 997 A.2d 982, 984 (N.J. 2010). At any rate, the possibility of forfeiting a potentially meritorious claim on abstruse procedural grounds is not in the spirit of the Federal Rules, including Rule 56, and I will not take such a step without ensuring that I possess the necessary facts.

### D.   **Remaining Medical Defendants**

The remaining, non-specialist, non-physician Medical Defendants are

| | |
|---|---|
| David Maxey, PhD | —licensed psychologist |
| Veronica Nendze | —Registered Nurse (RN) |
| Maria Delgado | —RN |
| Bernice Picerno-Jones | —RN |
| Theresa Boblick | —Licensed Practical Nurse (LPN) |

### 1.   Psychologist David Maxey, PhD

Psychologists are not included in the list of "licensed persons" as to whom an Affidavit of Merit is required. *See* N.J. Stat. Ann. § 2A:53A–26 (reprinted in Appendix at the end of this Opinion); *Troy D. v. Mickens*, No. CIV.A. 10-2902 JEI, 2013 WL 3169223 at *3 (D.N.J. June 20, 2013) ("... Defendants are all psychologists. Psychologists are not included in the list of licensed persons under N.J.S.A. 2A:53A–26. Therefore ... no affidavits of merit are required.")

Defendant David Maxey is not a physician. He is, and is sued as, a psychologist. Because no Affidavit of Merit is required as to him, his motion for summary judgment based on the absence or inadequacy of an Affidavit of Merit must be denied. Whether any malpractice has been alleged or shown is, of course, a separate question.

### 2.   Nurses Nendze, Delgado, Picerno-Jones, and Boblick

That leaves the four defendant nurses—three of them RNs, and the other an LPN. Dr. Hua's Report, as it happens, mentions only one of the four: Nurse Picerno-Jones. I will grant the motion for summary judgment as to all four, however, on more fundamental statutory grounds.

Section 27 requires in every case of professional malpractice that an Affidavit of Merit be furnished by an "appropriate licensed person." That is an initial gate through which every malpractice case must pass; the Section 27 "appropriate licensed person" requirement is prior to, and separate from, the subsequent and more specialized requirements of Section 41. That foundational "appropriate licensed person" requirement implies congruence between the license possessed by the AOM affiant and that possessed by the defendant. The statute does not elaborate further; the State Supreme Court has not spoken; and there is little case law on this specific point. The Appellate Division, however, has given trial judges some guidance.

In an opinion written by Judge Sabatino, that Court held that the affiant must "possess the *same category of professional license* as the defendant who

has been sued." *Hill Int'l, Inc. v. Atl. City Bd. of Educ.*, 106 A.3d 487, 503 (N.J. Super. App. Div. 2014) (emphasis added).[24] By the "same category" of license, *Hill* meant that the affiant and the defendant must be licensed in "the same category of professionals listed in the sixteen subsections of N.J.S.A. 2A:53A–26. A perfect match of credentials within the same license is not always required." *Id.; see Szemple*, __ F. Supp. 3d at __, 2016 WL 542102 at *10–*11.

In other words, a licensed professional can reasonably expect to be judged by the standards of that profession, and not some other. 106 A.3d at 503. As to that issue, the licensed profession listed in N.J. Stat. Ann. § 2A:53A–26 is the appropriate unit of analysis. (*See* listing of professions under Section 26 in attached Appendix.) Thus, against an architect (regardless of specialty), another architect, but not an engineer, may serve as an AOM affiant. Whether the engineer's expertise overlaps with that of an architect is immaterial. *Id.* at 499–503. Similarly, in a tax malpractice case, a lawyer may not file an AOM as to an accountant, or *vice versa*, even though both may be well qualified to prepare a tax return. *Id.* at 502.

As luck would have it, *Hill* chose precisely our situation to illustrate the point:

> For instance, it would be contrary to the text and purposes of the AOM statute to allow a licensed nurse to serve as a qualified affiant against a licensed physician who, for example, negligently took and recorded a patient's blood pressure. Although nurses and physicians are both trained and authorized to take blood pressure readings, they are each still held professionally accountable under the standards of care of their own individual professions. It would thwart the screening objectives of the AOM statute to allow a nurse to vouch for a medical malpractice claim asserted against a physician, *and vice-versa*.

*Hill,* 106 A.3d at 502 (emphasis added). To drive the nurse/doctor example home, *Hill* added that this foundational "like-licensed" requirement of Section 27 was independent of the additional, stringent requirements of Section 41:

---

[24]   The New Jersey Supreme Court has granted leave to appeal from the Appellate Division's decision in *Hill.* 112 A.3d 589, 116 A.3d 1069 (N.J. 2015). I cannot speculate as to the likelihood of, or grounds for, affirmance or reversal.

> We reach that conclusion independently of the Legislature's 2004 amendments for affiants in medical malpractice cases. *See* N.J.S.A. 2A:53A–41. Those amendments imposed additional requirements regarding specialization to the licensing requirement in N.J.S.A. 2A:53A–27.

*Id.* at 502 n.10.[25] In short, the Section 27 "appropriate licensed person" requirement applies in every case; the Section 41 requirements are additions, not alternatives, that apply in medical cases.

Here, the relevant, listed, licensed profession is that of "a registered professional nurse pursuant to P.L.1947, c. 262 (C.45:11-23 et seq.)." N.J. Stat. Ann. § 2A:53-26(i). All four of the nurse defendants meet that description. And nursing is listed as a profession distinct from that of, *e.g.*, an accountant, an architect, or even a physician. *See* N.J. Stat. Ann. § 2A:53-26(a), (b), (f). So, for purposes of the Section 27 "appropriate licensed person" requirement, the only permissible affiant as to a nurse is another nurse. It follows that, as to a nurse, a physician like Dr. Hua is not an appropriate, like-licensed AOM affiant. *See Hill, supra.*

The motions for summary judgment are therefore granted as to the four nurse defendants: Nurses Veronica Nendze, Maria Delgado, Bernice Picerno-Jones, and Theresa Boblick.

## E.   Lack of a *Ferreira* Conference

Plaintiff complains that this case did not enjoy the clarifying effect of a *Ferreira* conference, and accuses the Medical Defendants of "gamesmanship" in letting the 120-day AOM deadline lapse before moving for summary judgment.

Plaintiff refers to the following procedural requirement, which applies in State court:

---

[25]    I therefore do not reach the vexed question of whether and how, for example, the "general practitioner" standard of Section 41(b) would apply to a nurse. *See Harbeson v. Underwood-Mem'l Hosp.*, No. A-2151-08T2, 2009 WL 1766598 (N.J. Super. Ct. App. Div. June 24, 2009). It is settled, however, that the "same specialty" rule of Section 41(a) applies only to doctors. *Lomando v. United States*, 667 F.3d 363, 387 (3d Cir. 2011).

> [T]he New Jersey Supreme Court required that an accelerated case management conference be held within 90 days of the service of the answer in all malpractice actions. *See Ferreira v. Rancocas Orthopedic Assocs.*, 178 N.J. 144, 836 A.2d 779, 785 (2003). At this conference, if the plaintiff has not filed an affidavit, the trial court is to remind it of the requirement. *Id.*

*Nuveen,* 692 F.3d at 291. It is well settled, however, that the requirement of a *Ferreira* conference does not apply in federal court. *Id.* at 304–05. And even in State court, the lack of a conference has rarely excused even a deadline, let alone a nonexistent or inadequate AOM. *See Seldon v. Rebenack, Aronow & Mascolo,* 541 F. App'x 213, 215 n.3 (3d Cir. 2013 ("Even if we could consider the [procedurally forfeited] argument, the law in New Jersey is clear that the failure to schedule a *Ferreira* conference has no effect on the time limits set forth in the Affidavit of Merit Statute.").

Plaintiff cites *Buck v. Henry,* 25 A.3d 240 (2011), a case in which the requirement of a *Ferreira* conference was neglected. There, however, the plaintiff filed what seemed to be an adequate AOM, until the defendant physician revealed the previously-undisclosed information that he was a specialist. *Buck* permitted a new conference and resubmission of the affidavit, but announced a prospective rule that a physician sued for malpractice must, in the answer, disclose his or her specialty. So *Buck* was seemingly a ticket good for one ride only.[26] At any rate, *Buck* is a far cry from our situation. Here, all of the Medical Defendants' specialties were disclosed, in discovery before the 2AC was answered and again in the Answer itself. *See* Section II.C, *supra.*

Nor is the accusation of "gamesmanship" well taken. This is the second time that defendants have moved to dismiss the action based on the failure to file an AOM. Denying relief on the first motion, I explicitly held that the

---

[26]     To similar effect is *Paragon Contractors, Inc. v. Peachtree Condo. Ass'n,* 997 A.2d 982, 984 (N.J. 2010) (failure to hold conference does not toll time limits, but "because there is obviously confusion in the ranks over the scheduling of the *Ferreira* conference and the effect of its omission on the requirements of the Affidavit of Merit statute, we have concluded that relief should be afforded to the parties in the limited circumstances of this case.").

Plaintiff's deadline to file an AOM would start running from the date that the Medical Defendants filed their Answers to the Second Amended Complaint. *See* Section I.C, *supra.* Plaintiff has therefore been "remind[ed] ... of the [AOM] requirement," *Nuveen,* 692 F.3d at 291, in the clearest possible terms.

Despite being given ample time, instead of obtaining an Affidavit of Merit, Plaintiff's counsel fell back on a previously served expert report; and instead of just complying, counsel invoked the "substantial compliance" doctrine. That may not have been the most straightforward choice, but it was an informed one.

Neither the lack of a *Ferreira* conference nor alleged gamesmanship by defendants is grounds for denial of the summary judgment motions.

## CONCLUSION

For the reasons stated in the foregoing Opinion, the summary judgment motions are granted in part and denied in part, in accordance with the accompanying Order. Because all counts are alleged in blanket fashion against all defendants, counsel shall particularly note the requirement of ¶ 4 that they confer and file a joint statement of all claims and parties that remain.

**KEVIN MCNULTY**
**United States District Judge**

Dated: March 29, 2016

**APPENDIX: TEXT OF KEY SECTIONS OF THE AOM STATUTE**

**Preamble to New Jersey Medical Care Access and Responsibility and 2004 Act of 2004 (L. 2004, c. 17, § 2)**

a. One of the most vital interests of the State is to ensure that high-quality health care continues to be available in this State and that the residents of this State continue to have access to a full spectrum of health care providers, including highly trained physicians in all specialties;

b. The State's health care system and its residents' access to health care providers are threatened by a dramatic escalation in medical malpractice liability insurance premiums, which is creating a crisis of affordability in the purchase of necessary liability coverage for our health care providers;

c. One particularly alarming result of rising premiums is that there are increasing reports of doctors retiring or moving to other states where insurance premiums are lower, dropping high-risk patients and procedures, and practicing defensive medicine in a manner that may significantly increase the cost of health care for all our citizens;

d. The reasons for the steep increases in the cost of medical malpractice liability insurance are complex and involve issues related to: the State's tort liability system; the State's health care system, which includes issues related to patient safety and medical error reporting; and the State's regulation and requirements concerning medical malpractice liability insurers;

e. It is necessary and appropriate for the State to take meaningful and prompt action to address the various interrelated aspects of these issues that are impacted by, or impact on, the State's health care system; and

f. To that end, this act provides for a comprehensive set of reforms affecting the State's tort liability system, health care system and medical malpractice liability insurance carriers to ensure that health care services continue to be available and accessible to residents of the State and to enhance patient safety at health care facilities.

**N.J. Stat. Ann. § 2A:53A-26**

As used in this act, "licensed person" means any person who is licensed as:

a. an accountant pursuant to  P. L.1997, c. 259 (C.45:2B-42 et seq.);

b. an architect pursuant to R.S.45:3-1 et seq.;

c. an attorney admitted to practice law in New Jersey;

d. a dentist pursuant to R.S.45:6-1 et seq.;

e. an engineer pursuant to P.L.1938, c. 342 (C.45:8-27 et seq.);

f. a physician in the practice of medicine or surgery pursuant to R.S.45:9-1 et seq.;

g. a podiatrist pursuant to R.S.45:5-1 et seq.;

h. a chiropractor pursuant to P.L.1989, c. 153 (C.45:9-41.17 et seq.);

i. a registered professional nurse pursuant to P.L.1947, c. 262 (C.45:11-23 et seq.);

j. a health care facility as defined in section 2 of P.L.1971, c. 136 (C.26:2H-2);

k. a physical therapist pursuant to P.L.1983, c. 296 (C.45:9-37.11 et seq.);

l. a land surveyor pursuant to P.L.1938, c. 342 (C.45:8-27 et seq.);

m. a registered pharmacist pursuant to  P.L.2003, c. 280 (C.45:14-40 et seq.);

n. a veterinarian pursuant to R.S.45:16-1 et seq.;

o. an insurance producer pursuant to  P.L.2001, c. 210 (C.17:22A-26 et seq.); and

p. a certified midwife, certified professional midwife, or certified nurse midwife pursuant to R.S.45:10-1 et seq.

**N.J. Stat. Ann. § 2A:53A-27**

In any action for damages for personal injuries, wrongful death or property damage resulting from an alleged act of malpractice or negligence by a licensed person in his profession or occupation, the plaintiff shall, within 60 days following the date of filing of the answer to the complaint by the defendant, provide each defendant with an affidavit of an appropriate licensed person that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices.  The court may grant no more than one additional period, not to exceed 60 days, to file the affidavit pursuant to this section, upon a finding of good cause.

In the case of an action for medical malpractice, the person executing the affidavit shall meet the requirements of a person who provides expert testimony or executes an affidavit as set forth in section 7 of P.L.2004, c.17 [N.J. Stat. Ann. § 2A:53A-41]. In all other cases, the person executing the affidavit shall be licensed in this or any other state; have particular expertise in the general area or specialty involved in the action, as evidenced by board certification or by devotion of the person's practice substantially to the general area or specialty involved in the action for a period of at least five years.  The person shall have no financial interest in the outcome of the case under review, but this prohibition shall not exclude the person from being an expert witness in the case.

**N.J. Stat. Ann. § 2A:53A-41**

In an action alleging medical malpractice, a person shall not give expert testimony or execute an affidavit pursuant to the provisions of P.L.1995, c. 139 [N.J. Stat. Ann. § 2A:53A-26 *et seq.*] on the appropriate standard of practice or care unless the person is licensed as a physician or other health care professional in the United States and meets the following criteria:

a. If the party against whom or on whose behalf the testimony is offered is a specialist or subspecialist recognized by the American Board of Medical Specialties or the American Osteopathic Association and the care or treatment at issue involves that specialty or subspecialty recognized by the American Board of Medical Specialties or the American Osteopathic Association, the person providing the testimony shall have specialized at the time of the occurrence that is the basis for the action in the same specialty or subspecialty, recognized by the American Board of Medical Specialties or the American Osteopathic Association, as the party against whom or on whose behalf the testimony is offered, and if the person against whom or on whose behalf the testimony is being offered is board certified and the care or treatment at issue involves that board specialty or subspecialty recognized by the American Board of Medical Specialties or the American Osteopathic Association, the expert witness shall be:

(1) a physician credentialed by a hospital to treat patients for the medical condition, or to perform the procedure, that is the basis for the claim or action; or

(2) a specialist or subspecialist recognized by the American Board of Medical Specialties or the American Osteopathic Association who is board-certified in the same specialty or subspecialty, recognized by the American Board of Medical Specialties or the American Osteopathic Association, and during the year immediately preceding the date of the occurrence that is the basis for the claim or action, shall have devoted a majority of his professional time to either:

(a) the active clinical practice of the same health care profession in which the defendant is licensed, and, if the defendant is a specialist or subspecialist recognized by the American Board of Medical Specialties or the American Osteopathic Association, the active clinical practice of that specialty or subspecialty recognized

39

by the American Board of Medical Specialties or the American Osteopathic Association; or

(b) the instruction of students in an accredited medical school, other accredited health professional school or accredited residency or clinical research program in the same health care profession in which the defendant is licensed, and, if that party is a specialist or subspecialist recognized by the American Board of Medical Specialties or the American Osteopathic Association, an accredited medical school, health professional school or accredited residency or clinical research program in the same specialty or subspecialty recognized by the American Board of Medical Specialties or the American Osteopathic Association; or

(c) both.

b. If the party against whom or on whose behalf the testimony is offered is a general practitioner, the expert witness, during the year immediately preceding the date of the occurrence that is the basis for the claim or action, shall have devoted a majority of his professional time to:

(1) active clinical practice as a general practitioner; or active clinical practice that encompasses the medical condition, or that includes performance of the procedure, that is the basis of the claim or action; or

(2) the instruction of students in an accredited medical school, health professional school, or accredited residency or clinical research program in the same health care profession in which the party against whom or on whose behalf the testimony is licensed; or

(3) both.

c. A court may waive the same specialty or subspecialty recognized by the American Board of Medical Specialties or the American Osteopathic Association and board certification requirements of this section, upon motion by the party seeking a waiver, if, after the moving party has demonstrated to the satisfaction of the court that a good faith effort has been made to identify an expert in the same specialty or subspecialty, the court determines that the expert possesses sufficient training,

experience and knowledge to provide the testimony as a result of active involvement in, or full-time teaching of, medicine in the applicable area of practice or a related field of medicine.

d. Nothing in this section shall limit the power of the trial court to disqualify an expert witness on grounds other than the qualifications set forth in this section.

e. In an action alleging medical malpractice, an expert witness shall not testify on a contingency fee basis.

f. An individual or entity who threatens to take or takes adverse action against a person in retaliation for that person providing or agreeing to provide expert testimony, or for that person executing an affidavit pursuant to the provisions of P.L.1995, c. 139 (C.2A:53A-26 et seq.), which adverse action relates to that person's employment, accreditation, certification, credentialing or licensure, shall be liable to a civil penalty not to exceed $10,000 and other damages incurred by the person and the party for whom the person was testifying as an expert.